May it please the court, my name is Jeff Friedman and I represent the plaintiffs in this action against Apple, Inc. At the outset, your honors, what I'd like to do is make sure that we frame the danger that the plaintiffs are alleging exists based on the design by Apple of the iPod. Because it's important to understand the issue as framed in order to then follow through the legal analysis. The fundamental issue that we are focused on is that Apple designs the iPod to exceed the safe listening limits. There's no dispute on that issue. There was never a dispute on that issue at the district court level. The safe limiting, the safe limit is 85 decibels. The complaint alleges the iPod reaches decibels as high as 100 to 10 to 114 decibels. Mr. Friedman, that's if the user of the iPod wants to turn it up. That's correct, your honor. Wants to use it in that fashion. And that's like saying an automobile may go 100 miles an hour if any fool wants to drive it that fast. Well, your honor, I'm going to get to the distinction that precisely is the one. Why don't you get to it now? Okay. And that distinction, your honor, is that that car has 100 miles an hour on the dashboard. That car is driving on a freeway that is regulated at 55, 65 or 25. And therefore, the user of that car is well informed exactly as to how fast he or she is going as well as what the safety limit is. For an iPod, your honors, there is no meter that informs you as to either exactly how high you're listening to it relative to the danger or where that danger level is. All right. Let's take a stereo system. An example closer to home. There's no meter on a stereo system generally saying how loud you can play it. Sometimes you can go to 11, I guess, in the old. Or none on those boom boxes on the cars going by. Well, your honor, there's significant differences. First of all, whether it's a boom box, your honor, or whether or not it's your home stereo, one of the other allegations that is central to understanding the particular danger is that you are piping the sounds directly into the ears with the earbuds. Right. But you can do that with your home stereo system, too. One could, your honor. And we could come up with a panoply of potential scenarios that could be dangerous. But we're focused on the design of this particular product. The design of this particular product is the danger is because there's inadequate information for the user to know when it becomes dangerous. Every single, whether it's 80% of the audience members in this here, I would wager there would be a large percentage of people that have iPods. And if I handed out an iPod to each and every individual in this room and said, listen to it responsibly. Only listen to it for the amount of time and at the height of the volume level so that you don't hurt your ears. So you don't have noise-induced hearing loss. There could be no informed decision made. We have allegations in the complaint, your honor, that as tested, the iPod exceeds the 85 decibel level at 60%, 60% of the volume meter. We also have allegations in the complaint where studies have been done based on the combination of how the iPod is used. And that is it's used in transit. It's used in subways. It's used on planes. It's becoming ubiquitous. And that because the combination of the absence of information with the earbuds that have no sound-isolating properties, that when ordinarily used, a great majority of the users exceed 85 decibel levels. Unknowingly, unknowingly is the issue here. The company has designed a product so that it, without dispute, can cause hearing loss. We have allegations in the complaint that when used ordinarily, a large majority of the users exceed the safe limits. We have allegations in the complaint that they could but do not inform adequately either of the risk or even if they had stamped on the iPod. And this is the point. Stamped on the front of the iPod, your honors, dangerous to listen to, too loud. A consumer couldn't determine what is too loud. That's the heart of the issue. Without that information, without 55 miles an hour or 100 miles an hour on your speedometer, without knowledge of what is the appropriate speed to be driving under these conditions, you cannot say that a user of a car can adequately accommodate for that danger. So that is the heart of the allegation of the design. And the fact is, is that in combination with the earbuds set in the ears, as well as the long life of the battery, the... Some say. Some say, your honor. I'm not talking about necessarily of the iPhone, but of the iPod. Combined with the design that Apple has designed it beautifully and obviously wide consumer acceptance, but the purpose is to use the product in all conditions. But isn't it, for example, going back to the car analogy, it is a crime to go too fast for conditions. That's vague, but the individual driver has to assess whether or not you're driving too fast for conditions. And I understand you. This is irrespective of the speed limit, the speedometer, and you have different sounds, songs that are recorded at different levels depending on your dial. You say this is going 60, 70 percent of the dial up. It's going to vary from song to song. Why is it really ultimately up to the user to be able to determine how loud it is? That's exactly right, your honor. We're saying that's exactly what should happen. The user should be allowed to knowingly make that determination. But how can you possibly design... I take your point that you could design a product that would transmit that most of the time. Your honor, European Commission just last week for MP3s is ordering all MP3 players in Europe to be designed so that it automatically defaults to 80 dBs because of this very problem. Now, the user thereafter will be able to make a knowingly decision if he wants to exceed that. That's fine. That consumer choice is fine. But absent that information, it is not intelligent and knowing in terms of avoiding the risk. So that is the issue in terms of the danger that was lost on the district court. Well, it's lost, I think, in part because you're talking classic products liability law, and you can't plead that in this case because your clients don't have any damage. So what you have to do is, and I understand your argument, but it's a tougher argument on the implied warranty of merchantability and implied warranty of fitness for a particular purpose. Well, we're focused on merchantability, your honor. And as we briefed extensively in our reply brief from, I believe, pages 6 to 11, the implied warranty of merchantability, and this is, again, another core issue in terms of understanding the dynamics of the legal arguments that they're making, and that is the implied warranty of merchantability is a product liability. It falls within the product liability generic template. Personal injury in tort and strict liability in tort sprung from contract law, sprung from the implied warranty of merchantability, fitness for ordinary use. The difficulty was, in the 60s and the evolution of the cases in Greenman and following with Seeley and then ultimately in Barker, was recognizing that consumers were still being subject to design decisions that they were being physically injured by, that because of contract law they were limited to be able to recover. For example, because of privity of contract, because of also disclaimer law on contract. And so what the courts did was expanded the ability for consumers who bought unreasonably dangerous products to be able to recover when they were personally injured. They did not, however, in the evolution of law, they did not, however, then cut off and cabin contract law in warranty, implied warranty of fitness to say this doesn't apply. No, I understand that, but the theories are a little broader under product, you'd have to agree. Under merchantability, you have a very narrow definition, a narrow range of what's merchantable and unmerchantable in a product. Your Honor, this is the precise point that we briefed, and that is for fitness for ordinary use. I thought you were talking about merchantability. That is a prong of merchantability, Your Honor, is fitness for ordinary use under the Consumer Code, and it's used interchangeable. But we've briefed specifically that fitness for ordinary use includes that a product has to be or cannot be unreasonably dangerous. That is been interpreted by case law in the Supreme Court of California in Howder v. Zogart, and the district court agreed. The district court did not say there isn't a requirement for fitness for ordinary use that the product not be unreasonably dangerous. What the district court went on to do is say he substituted his judgment at the pleading stage and said, however, I find this product is not unreasonably dangerous because I find that it's obvious. Part of the questioning is it's obvious. Well, first of all, Your Honors, again, this was a pleading stage. And the issue of obvious under the law is a factual determination, number one. Number two, I anticipate counsel is going to argue that even under the standard that we are seeking, what the court has to look at on the pleadings is whether or not there's a substantial certainty that the product causes injury. Well, that's not the law for testing whether a product is unreasonably dangerous. The two tests, neither of which the district court applied, and nor should he have because it was a 12b-6, is twofold, consumer expectation test, whether or not it meets the minimal standard of consumer expectation in terms of safety, which the jury may find it does, Your Honor. It very well may find it does. But that's a jury question down the road. And the second, which is in the alternative, is risk versus utility test. And this is the exact issue that they are raising with respect to we're just alleging it's a risk of injury. Well, absolutely. That's the test for unreasonable dangerousness. Does the risk of injury based on the design outweigh the utility and choice that they made to have it exceed 80 dBs, not to warn, not to provide a meter? That is the exact test that we intend to present to a jury, which is a factual and we've cited case law that it's a highly factual test. So I see in terms of reserving my time that I'm up, so I'll reserve. Thank you, Your Honor. All right. Good morning, Your Honors. David Burnick for Apple. Mr. Burnick, before you start, why don't you, would you mind moving, if you're going to use that audio or the domestic, why don't you move it over here so you don't block the audience's view and so the counsel can see it? Yeah, that's. All right. Thank you. I'm going to have Mr. Lico, if he would, draw a couple things on so I don't have to leave the microphone. Always desirable. Go ahead, Mr. Burnick. Thank you very much. I want to get to the 85 dB and the idea that we can put a little notch on the dial in just a moment. But I think that that really is the least of the problems that we have in connection with this case. We have in this case a very, very bold and innovative legal theory. And it's bold and it's innovative, but it's also wrong. And it's wrong in three distinctive ways. The first way in which it's wrong is that it asks this court, a federal court, as it asks the district court, to go back over a piece of jurisprudence that's probably one of the most prominent, influential, well thought through and detailed pieces of jurisprudence ever to come out of the California Supreme Court. And that's the piece of jurisprudence that deals with this whole issue of strict liability and breach of warranty. This has been something that's been in process for over 40 years. And central to that jurisprudence ever since the Seeley case is a fundamental distinction, a fundamental distinction between recovery for a tort and recovery for an economic or commercial loss. That was exactly the distinction that was drawn in the Seeley case. And it was drawn because there's a fundamental difference in jurisprudential policies. And they were plainly articulated. The whole basis for Seeley was to draw the distinction between a product liability case and a commercial case such as this. And the jurisprudential policies were different in the following way. If you have a product that actually causes a tort injury, which God bless doesn't happen very frequently, those people who suffer that injury are enabled in their litigation by a standard of care that's applied to the manufacturer that is a very high standard of care, strict liability. And under that standard, it's not enough that there wasn't an explicit bargain, there wasn't an explicit contract or negotiation. It really is, it enables the jury to apply the two prongs that counsel referred to and determine that there's an entitlement to recovery, even if there's no bargain whatsoever. In dramatic contrast, if you have a commercial or economic loss, a commercial or an economic injury, that will read down to the benefit of everybody who bought the product. They get their money back. We're not talking about just people who were injured. We're talking about everybody who bought the product. And under those cases, it is up to the consumer in the course of a bargain for negotiation or the law may imply an understanding to be able to protect himself during the course or herself during the course of the negotiation process. Now, I probably didn't do as good a job as Justice Treanor did and originally Justice Tobriner did and all the other members of the California Supreme Court who have spoken to this issue over time and again and again and again articulated this difference. But that is the essential difference. It is now argued in this case, and you heard it again this morning, it's all throughout their briefs, no, no, we have an economic loss case and now strict liability is the rule for everybody. Now, there was no recent California Supreme Court decision that came out and said that. There's no California decision that came out and said that. So the plaintiffs purport to find actually in the very cases that draw these distinctions and forcefully and purposefully purport to find that they didn't really mean what they said. So we get a citation to a dissent in the Seeley case. We get a citation to some commentary in the Barker case about the provenance of one of the prongs for testing strict liability. That's not the law of California. And yet you heard just this morning, it's said yet again. That is not the law of California. There's no reason to be applying it here. So then the question is, well, what about in the context of safety? What if we have a safety issue and we don't have a tort damage, but we still have an economic damage? Shouldn't the two standards really merge and be the same? And the answer is that the California courts diligently have followed through on this basic differentiation between economic loss and tort loss all the way down to each of the different types of warranty and have created a jurisprudence that preserves the distinction between economic loss cases and tort cases even when it comes to each of the different types of warranty, including merchantability. And to have a claim for breach of merchantability, as counsel concedes is the central issue in this case, you don't simply apply strict liability. Everything is different. The standard is a standard of minimum quality. Those are the words of American Suzuki. American Suzuki was far from being overruled or changed by the Hicks case. It was distinguished in the Hicks case. It involved different facts. The idea of minimal standard of quality actually comes out of a whole series of cases in other jurisdictions that preceded the American Suzuki case. It is minimum standard of quality. That is far cry from the standard of strict liability in tort. The use that is the use of reference, what is the use that has to be foreseen, again, totally different. For merchantability is ordinary use. In tort, it's not ordinary use. It is all reasonably foreseeable use, including carelessness. You can't say that those are the same. They're entirely different. And when it comes to injury, counsel says we're going to say the standard for injury in merchantability is there has to be a substantial certainty of an actual injury. And that comes right out of the Hicks case. I didn't make that up. But even if you accept the broader standard that's been applied in some of the federal cases, the key thing to find that there's a merchantability problem when it comes to safety, and this is key, the key thing that must be there to find a merchantability problem when it comes to safety is that there's a risk for each and every single user of the product. Everybody. Because you're talking about a doctrine that's going to give money away to everybody if there is a problem and a defect. It can't be that just a risk that certain people may experience enables everybody who bought the product to get their money back. That's not what the law says. Go ahead. Mr. Furnick, it's an interesting argument that you make in your theories and all. But here the claim is that there was a risk, an unknown risk, I guess, to users of the iPod that with long usage at high volume levels, harm to the ear or the hearing would occur. Okay? Yes. Now, if that's the claim, you're saying you cannot peg a merchantability loss onto that because we don't have any certainty of injury? Is that it? It's really all three. And I had a little package that I wanted to provide to your honors. I believe you have it. It's page three. And page three draws this distinction, I think, as precisely as I could. It says that where you have an economic loss claim, the claim is based upon a standard of minimum level of quality. The relevant use is ordinary use. And then what's required in the way of injury is, first of all, is economic loss. But then under Hicks, it must be substantially certain for all users. All users. Hicks was everybody who had a foundation, that foundation was going to fail at some point, regardless of how it was used. Everybody. Now, I would concede that there are cases, mostly federal cases, that seem to suggest, well, as long as there is a risk, like the Sanchez case, with the stroller with the pinch point, as long as there's a risk, it doesn't actually have to manifest all over the place. And I would acknowledge, I think that's different from California state law, per Hicks and per American Suzuki. But I would say, and that's why I put up here, required risk or injury. The risk must still be there for all users. So when it comes to the iPod, and the iPod is also different, another way that I want to get to before I run out of time. When it comes to the iPod, it's not enough that certain people who use it may be at risk. We're talking about merchantability, something that affects all users, so all users can say it's a defect and they get their money back or they get a replacement, regardless of how they use it. So I would say in answer to Your Honor's question, if there is a risk to certain users and you don't have something like we've actively concealed it or we've misrepresented it or we gave a warranty that says that it's not there, but if there's a diminution in the acceptability of this product with respect to certain people because there is a risk depending upon how they use it, that is, as a matter of law, not actionable as a breach of the warranty of merchantability. I don't believe there's a single case that says that it is. Now, what is also different, though, about the – But, you know, we're at the pleading stage in this case. That's the difference, which means that they can plead that there's a risk to everybody, and you disagree with that, but that's their option to plead. Their theory is different. Their theory is that there is a risk to everybody because the decibels aren't disclosed. Okay. Well, let me – Among other theories. Let me address that. Let's assume all that is true, and I want to get to Twombly and Iqbal and what I think the burden and the obligation that they impose upon the trial court here at some point when I respond to your question. But there are actually two very significant differences that make this case even easier than, in a sense, a lot of the others that have been out there, and the differences are these. First of all, the idea of the risk. This is not a risk that is experienced by everybody. It's not even a risk that must be experienced by anybody. This is a risk that stems from the ability of the product, the capability of the product, to being used at a high level of volume. So while you might say that we have tires that often fail, some of them fail, some of them don't. Firestone cases said that's not merchantability. That's not breach of merchantability. Feinstein case adopted and followed by the Colorado Court of Appeals in American Suzuki and not, of course, distinguished in the Hicks case. So even where you have a risk that is a real risk that must be undergone by some people who buy, that is not an actionable risk because it is not something that affects the totality of all buyers. But here, the risk is not even necessarily experienced by anybody. It is a risk that is there only in the event that the product is used at high volumes. So my question, again, was on the pleadings, not what your proof is going to be. Yes, because on the pleadings, this is what the pleading – this is not – Iqbal and Twombly say you strip away the conclusory allegations. Iqbal and Twombly say you look for the plausible facts. These folks have had four different complaints to file. They've attached scientific papers. They've attached everything. And what they can't do is to say that there's a risk that is necessarily borne by everybody who uses the iPod. And because they can't say that in fact from any source because it's wrong, they can't as a matter of law recover under California law of merchantability. That is a matter of law. That is not a matter of fact. I'm accepting their theory. Now, I want to get to the 85, and I want to get to one other point, and I know that I'm running out of time. You've got a minute and a half, so go. Okay, go. So 85 dB. The point about these lines and the theory that's being explored here, which is, well, people can't decide. That is true – you could say that about every single stereo that's out there. Without exception, amplified sound, none of it carries a little dial on it. You can say the same thing with respect to cars. You can say the same thing with respect to highly caloric food. These all fall in the same category, which is they are capable of misuse, but they do not have to pose any risk to any user if the product is used with moderation. And the best evidence of the fact that this is not the law that says that you've got to in the case of something that's well-known, which is high-volume use – people may not know the science, but they know high-volume use, and they know it can hurt your ears – where are the cases where there are massive product recalls of autos all over the country? All over the country, because they can be used to drive too fast. Where are the massive recalls for food, because it's too highly caloric? Where are the liability cases? They're arguing for strict liability here. Where are all the liability cases where fast food makers, automobile makers, they're all being sued, even in strict liability, because it turns out that the car can go too fast and you can eat too much food. It doesn't exist. Their legal theory doesn't exist. And to adopt it would be to mean you would have the product recalls. You would have the warnings are all up there. The key thing here is that that's not the law. That is not commercial law. It's not even strict liability law. It's a brand-new kind of law. And let me show you exactly how it's problematic here. First, we have plaintiffs who don't even say how they use the product. We don't know how they use the product. They don't say that they played it too loud. They don't say anything about that. They can't be plaintiffs here. They sustained no injury. They can't file this lawsuit after tobacco to even the class representative has to demonstrate that there's an injury. These people have absolutely no injury. They don't even disclose how they use the product. But let me just in these 20 seconds, if you put 85dB up on that dial, what are you saying to people? You're saying if you use it at 85dB, you're okay. Really? That's a warranty. Now you have to be right. Well, it turns out that 85dB has been completely, I don't say misrepresented, a very misleading way to this court. 85dB is a level that OSHA adopts for eight hours a day, five days a week, at least 20 to 40 years of exposure. It's an occupational standard. To say we've got to put on 85dB and the theory that kids will never grow up, they'll always remain kids, they'll always play it for eight hours a day, five days a week for 40 years, come on. That is completely misleading. And what about the people who have other impairments to their ears? 85dB may be too much. We can't say that it's safe for everybody. These kinds of things are a matter of judgment. It may be that the regulators exercise judgment one way, but we're not here to deal with what regulators in Europe might do. In the same fashion, 75 miles an hour, you can't say that that's safe. That's unbelievably dangerous in certain contexts. You can't say that any speed is safe in all conditions. So what do you do? You have a little book on your speedometer that everybody's got to study and figure out the science of hearing. You've got to study and figure out the science of speed. What about 250 calories? Your hamburger shouldn't have more than 250 calories. Well, these are all matters of common-sense judgment, and the law does not dictate how they take place. And just because somebody who happens to be filing the lawsuit is in here saying, oh, well, gee, I didn't know that, even though they don't even tell us that they actually use their iPods at high volumes, that they get to recover money. I think, Mr. Bernick, we've given you a couple extra minutes, and we seem to be moving into a new topic. Thank you. I guess in Mr. Bernick's world, we should dispense with science. And just apply everyone's common sense. In our world, we deal with pleadings. So why don't you talk about yours? The pleadings, Your Honor, go exactly to the court's question, which is we allege that the risk is to all users. That's our allegation. It's to all users because the design and the lack of information to be able to use it knowingly in a safe manner. That's the allegations. Not only are those the allegations, we have dozens, dozens of paragraphs in the complaint. With respect to estimates that are studies that youth, not just in the United States, but all across the world are being tested and found to have hugely elevated levels of noise-induced hearing loss. The ranges of the studies are between 25 and 50 percent of high school kids tested. The studies include estimates that in the generation of today, noise-induced hearing loss is two and a half times what it was in previous generations. We have studies that have specifically looked at the use of iPods under ordinary conditions. We know that iPods capture 70 plus percent of the market share. It's not as if we have a Twombly, conclusory, legal statement. These are unreasonably dangerous products. Moreover, with respect to Mr. Burnick's recitation of the law and the new standard that we're attempting to create, it's just flat wrong. If you look at Greenman, Seeley, if you look at those two cases, and you follow it up in 1978 by Barker after Seeley, still looking at the implied warranty of fitness for ordinary use, it is in every single commercial transaction. It's in every commercial transaction. And finally, I would just leave you with this, Your Honors. What they're arguing for is a situation where one could import into the United States millions of toys tainted with lead paint. And let's assume that parents learned at the time, after purchase of these millions of toys, before they unwrapped those toys, let's assume they learned that those toys contained lead paint at a toxic level, clearly exposing, exposing the risk of terrible debilitating diseases to children. According to Mr. Burnick, there is no ability to recover unless you let the children ingest paint or choose not to use the toys. It would shift the burden of consumer safety to the consumer, which is contrary to California law as well as, we believe, all law in the United States. Thank you. Thank you both for your arguments. The case is here to be submitted, and we'll take a short recess.
judges: Wallace, Thompson, Thomas